76 So.2d 879 (1955)
Paul T. SHULER and Christine W. Shuler, his wife, Appellants,
v.
O.G. ALLEN, Appellee.
Supreme Court of Florida, Division B.
January 7, 1955.
*880 Norton Josephson, Maurice Wagner, Daytona Beach, for appellants.
Berrien H. Becks, Walter A. Shelley, Daytona Beach, for appellee.
DREW, Justice.
This is an appeal from a judgment in favor of a real estate broker for a commission allegedly earned in connection with the sale of a motor court. In this opinion we shall refer to the appellants, Paul T. Shuler and Christine W. Shuler, his wife, as the sellers; the appellee, O.G. Allen, as the broker; H.O. Beckham and Katherine S. Beckham, his wife, as the purchasers; and Nina Connor as the cooperating broker. Neither the purchasers nor the cooperating broker are parties to the litigation, which was a common law action by the broker against the sellers to recover the commission.
We here point out and emphasize the fact that the amended complaint in this cause is cast in two counts. The first count alleged that the broker was employed by the seller "to procure a purchaser, ready, able and willing to buy said property, including furnishings, at a price of $100,000, with $50,000 to be paid in cash and the balance to be represented by a mortgage or mortgages, and promised and agreed to pay said plaintiff a brokerage commission for his said services in the sum of 5% of the total price, which amount is the brokerage commission customarily paid in said community for the sale of property of this character." The amended complaint proceeds to allege the association of the South Carolina broker, a rejected offer of $90,000, the attempt immediately thereafter to obtain a higher offer and the failure to obtain it; that the South Carolina broker "remained in continuous negotiations" with the purchasers and over a long period of time attempted to sell the purchasers' dry cleaning business and that the dry cleaning business was later sold directly by the purchasers whereupon and immediately thereafter Beckham came to Florida and purchased the motor courts from the sellers at a different price and on different terms from the original listing; and concludes with the following language: "That by reason of the foregoing the defendants, jointly and severally, became indebted to the plaintiff for commissions as aforesaid * * *; that the purchasers of said property were procured solely by the plaintiff through the said Nina Connor as his co-broker, and introduced by him to the defendants; that plaintiff has demanded the payment of said sum from the defendants but no part of same has been paid." The second count is for work done and services rendered. The complaint does not charge fraud or bad faith on the part of the sellers nor any unlawful or illegal conspiracy between the sellers and purchasers to evade the payment of the commission.
The broker's case consisted of the testimony of the broker, the wife of the purchaser and the cooperating broker. The exhibits offered in evidence consist only of certain pictures of the motor court, a newspaper advertisement in a South Carolina paper and a copy of an agreement under which the property was actually sold, *881 all of which are before us in the original form and none of which is material to the disposition of the cause here. It is pertinent here to observe that there was no correspondence at any time between any of the above mentioned parties with reference to the sale of the subject property offered in evidence or referred to in any of the testimony. The only material evidence in the case is oral.
The following facts were established by the testimony offered by the plaintiff:
Early in 1951, the sellers orally listed for sale with the broker the Colonial Hotel Court at Holly Hill, Florida and employed the broker to procure a purchaser ready, willing and able to buy said property at a price of $100,000, $50,000 to be paid in cash and the balance to be represented by a mortgage or mortgages. The commission to be paid the broker in the event of a fulfillment of the contract of employment was to be 5% of the purchase price.
`The broker formerly resided in Columbia, South Carolina and had business interests there. He brought such listing to the attention of his co-broker in Columbia, South Carolina and sometime during the month of June, 1951, the purchasers called on the co-broker and evidenced their interest in the property. The broker later went to South Carolina and negotiated with the purchasers, and, as a result of such negotiations, the purchasers visited Daytona Beach in early July of 1951, met the sellers and examined the motor court. The purchasers returned to South Carolina and in August the broker and co-broker procured the signature of the purchasers to a contract for the price of $90,000, with $45,000 to be paid in cash and the balance secured by mortgages and at the same time procured from the purchasers a check for $9,000 as a deposit on account of the purchase. The check and the contract were tendered to the sellers who refused it with the statement that their price was $100,000 and that they could accept no less. Whereupon, the broker went back to South Carolina, returned the contract and the check to the purchasers and discussed the matter with them. The purchasers would not raise their offer and suggested at that time that if they could sell a dry cleaning business they had up there, they would be interested in continuing negotiations and at that or a later date did list the dry cleaning business with the co-broker for sale and she did on a number of occasions advertise it for sale.
The broker returned to Florida and, according to his testimony, went back to the sellers in October of 1951 and suggested that if they would reduce their price $2,500, he might be able to get another offer, explaining that the purchasers were trying to sell their dry cleaning business but had been unable to procure a purchaser but that if the sellers could reduce their price, thereby enabling the purchasers to reduce theirs, that a deal might be worked out. According to the broker, Mr. Shuler told him that he would give him a few days to work on it. He presented the proposition to the purchasers but they turned it down.
It is alleged in the complaint that there were continuous negotiations from then on until in March of 1953 when the property was finally sold in direct negotiation by the sellers to the purchasers but the testimony of the broker does not establish that there were continuous negotiations as contemplated by law. The broker does testify as to periodic conferences from time to time in the intervening months between himself and his co-broker and the purchasers but he makes no contention that he ever from October, 1951 until the property was actually sold in March, 1953, conveyed the information to the sellers that he was continuing the negotiations or that the sellers had any knowledge whatever of such fact. The testimony of the broker was that after the offer of $90,000 was rejected in August of 1951, he never mentioned the matter again to the sellers until after the sale was consummated in March of 1953.
The broker testified that during the intervening period he had shown the motor courts to a few prospective purchasers but he does not testify that the sellers knew *882 he was working on the deal. He does testify that he told the sellers he would like an opportunity to get a higher offer than the rejected $90,000 from the purchasers and the sellers gave him until the next morning to do so.
At the conclusion of the broker's presentation of his case, at which time the facts above related were the only material evidence in the record to support the allegations of the complaint, a motion was made by the defendant for a directed verdict which was denied by the court and this constitutes one of the assignments of error. We think the lower court was clearly in error when he refused to direct a verdict and we must reverse the cause for that reason.
The law is well settled that where the contract of employment between a seller and the broker does not contain a time within which the service is to be performed, the parties intended that such service should be accomplished within a reasonable time. 8 Am.Jur. 1086, par. 169. It is further clear from the authorities that the question of whether the time consumed is a reasonable time is one of law where the facts are undisputed. Erswell v. Ford, 205 Ala. 494, 88 So. 429. It is only in those cases when facts extrinsic to the contract are in dispute that it becomes a question for the determination of the jury. In this instance, taking the testimony most favorable to the plaintiff, a period of time from October, 1951 to March, 1953 elapsed before the sellers finally sold the property, during which time, so far as the sellers knew, the broker had taken no steps whatever to further negotiate with the purchasers who had tendered a contract which had been rejected or anyone else.
The sellers in this instance and under the facts in this case had the right to assume that the broker had abandoned his efforts in connection with the sale of this property to the purchasers. In the case of Parkey v. Lawrence, Tex.Civ.App., 1926, 284 S.W. 283, 287, it is said:
"If the broker voluntarily abandons his efforts, once begun, to find a purchaser for property, or fails to find one within a reasonable time, all without the fault of the owner, then his contract of employment is at an end, and thereafter the owner is at liberty to sell the property to any one, including the purchaser first found by the broker, either by means of negotiations directly with the purchaser or through the medium of another broker." (Emphasis added.)
Again in the case of Cobb v. Saucier, La. App., 1947, 30 So.2d 784, 787, it is said:
"The facts of this case in a large degree are very much like those of the case of Bullis & Thomas v. Calvert, 162 La. 378, 383, 110 So. 621, 623, wherein the court repeated the legal principles, often theretofore announced by it, controlling in cases of this character, in the following language, viz.: `On the other hand, this court has with equal consistency always held that, where a broker has failed to effect a sale, and negotiations have ceased or been broken off, the owner may take up the negotiations where they were left off and himself complete the sale, and the mere fact that the sale may in some degree have been aided by the previous efforts of the broker does not of itself entitle the latter to a commission; i.e., unless it clearly appear that those efforts were in fact the procuring cause of the sale.'"
The broker in this case is not protected by the rule set forth in Taylor v. Dorsey, 155 Fla. 305, 19 So.2d 876, to the effect that if the broker has brought the parties together and the sale is effected as a result of continuous negotiations inaugurated by him, he will be nevertheless entitled to his commission even though the sale eventually consummated is on terms and at a price different from those in the original listing or under the original employment. Continuous negotiations, as used in this decision, and as referred to in many *883 others, means continuous negotiations between the seller and the prospective purchaser conducted by the broker. It is a rule that is fair to both. The requirement of continuous negotiations is not complied with when the broker conducts his negotiations with the purchaser alone unless the seller participates in such negotiations or at least has knowledge of the fact that such negotiations are going on. To establish any other rule would result in manifest injustice and subject the owner of real estate to continuous and unwarranted liability and result in oppression. When the broker concluded the presentation of his testimony, he made no contention that he had placed the sellers on notice that he was continuing negotiations with the prospective purchasers or that the sellers had any knowledge whatever concerning such fact.
Some contention is made in the record that the sale of the motor court was contingent upon the sale of the purchasers' dry cleaning business in South Carolina. Even if this were a condition, and even if the sellers had been apprised of that condition at the time they refused the original offer, the lapse of some sixteen months at the very least from that time until the dry cleaning business was actually sold, not by the co-broker but by the purchasers themselves, cannot afford a basis for the recovery of a commission on that theory because the condition precedent, if such existed, was not performed within a reasonable time.
We denied recovery of a commission under a similar theory in the case of Judson v. Mobley, Fla., 1953, 62 So.2d 730.
When the purchasers came to Florida in February of 1953, resumed negotiations, which had been dropped some year and a half earlier, directly with the owners, which resulted in the sale of the court upon terms and on conditions vastly different from the original listing, the sellers did not subject themselves to the payment of a commission to the broker and the lower court committed error under such circumstances in failing to direct a verdict in favor of the defendant. Compare Wiggins v. Wilson, 55 Fla. 346, 45 So. 1011.
For the foregoing reasons, this cause is hereby reversed with directions to enter judgment in favor of the defendants.
ROBERTS, C.J., and THOMAS and HOBSON, JJ., concur.